914 So.2d 1272 (2005)
Kaelyn Darnell YOUNG, a Minor, by and Through His Next Friend, Rozella M. Young, for and on Behalf of the Wrongful Death Beneficiaries of Lewanda P. Young, Appellant
v.
The UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, Appellee.
No. 2004-CA-00393-COA.
Court of Appeals of Mississippi.
November 22, 2005.
*1273 Edward Blackmon, Jr., Canton, attorney for appellant.
Lanny R. Pace, Jackson, attorney for appellee.
EN BANC.
CHANDLER, J., for the Court.
¶ 1. Kaelyn Darnell Young, by and through his next friend, Rozella M. Young, filed suit against the University of Mississippi Medical Center (UMC) under the Mississippi Tort Claims Act, Mississippi Code Annotated § 11-46-1 to 23 (Rev. 2002), for the wrongful death of his mother, Lewanda P. Young. Young alleged that Lewanda's death was caused by UMC's negligence. After a bench trial, the Circuit Court of the First Judicial District of Hinds County found in favor of UMC. Young appeals, arguing (1) that the verdict was against the overwhelming weight of the evidence; and (2) that the court erroneously denied Young's spoliation motion. UMC asserts a cross-appeal that is contingent upon our finding in favor of Young.
¶ 2. Finding no error, we affirm. As we do not find in favor of Young, we do not review UMC's cross-appeal.

FACTS
¶ 3. On the afternoon of November 13, 1999, Lewanda underwent bilateral breast reduction surgery at UMC. Dr. Michael *1274 Angel performed the surgery, which lasted about two hours and forty-five minutes and ended at 3:00 p.m. At about 7:30 p.m. that evening, Lewanda experienced cramps in her legs. A nurse examined her legs and concluded that all signs were negative for the presence of blood clots. The next morning, Lewanda was examined by Dr. Kenneth Fisher and released from the hospital.
¶ 4. On November 15, 1999, approximately fifty-one hours after the surgery, Lewanda collapsed in her home. She was rushed to UMC by ambulance. Lewanda was pronounced dead minutes after arriving at UMC. An autopsy revealed that the cause of her death was a massive pulmonary embolus. A pulmonary embolus is a blood clot that develops in the body, travels through the arterial system, and lodges in the pulmonary artery, blocking the blood supply to the lungs and, potentially, triggering a fatal cardiac incident.
¶ 5. At a bench trial, Young sought to establish that UMC's negligence proximately caused Lewanda's death because UMC had not placed anti-embolic stockings on Lewanda before the surgery. It was established that anti-embolic stockings are plastic sheaths placed on the lower legs and then connected to a machine that inflates the stockings, providing compression during surgery. Dr. William Gibson testified that anti-embolic stockings help to prevent blood clots and should be used if a patient is to be under general anesthesia for longer than thirty to forty-five minutes. This is because the patient's immobility during general anesthesia can cause blood clots in the legs. In Lewanda's medical records, there was no documentation showing that the stockings had been used during her surgery. However, a nurse recalled that they had been used and said that she had forgotten to so note on the intra-operative report.
¶ 6. Dr. Angel, testifying for Young adversely, said that when he arrived in the operating room he was unable to see if Lewanda was wearing the stockings because her body was draped. He testified that anti-embolic stockings have been shown to reduce the incidence of blood clots in the deep veins of the legs during surgery. However, he said that no study showed that anti-embolic stockings could reduce the risk of a fatal pulmonary embolus. Dr. Angel opined that, though he orders anti-embolic stockings for his patients, the use of the stockings is not required by the standard of care and, therefore, UMC did not breach the standard of care.
¶ 7. Dr. David B. Apfelberg testified on behalf of Young in the field of plastic surgery. In his opinion, Lewanda had been at an increased risk for developing a pulmonary embolus because she was morbidly obese, was taking birth control pills, and had undergone a surgery lasting over thirty minutes. He testified that the standard of care required the use of anti-embolic stockings during any surgery lasting over thirty minutes and, especially, for a patient with Lewanda's other risk factors. He stated that it was documented in medical literature that anti-embolic stockings aid blood circulation and prevent blood clots from forming in the deep veins of the legs. He said that blood clots in the deep veins of the legs are a type of clot that can break off and travel to the lungs.
¶ 8. Dr. Apfelberg testified that, in medicine, if a certain act was not written into a patient's medical record, then it is assumed that the act was not done. In Dr. Apfelberg's opinion, since the use of anti-embolic stockings was not documented in Lewanda's medical records, the stockings had not been used. He opined that UMC had breached the standard of care by failing to use the stockings.
*1275 ¶ 9. The court found that the standard of care required the use of anti-embolic stockings during Lewanda's surgery. The court further found that Young had proved that the anti-embolic stockings had not been used during the surgery and that UMC had breached the standard of care. However, the court concluded that Young had failed to prove by a preponderance of the evidence that UMC's breach of the standard of care proximately caused Lewanda's death. The court found that Young had not shown that the embolus that killed Lewanda formed during or post-surgery, "permitting only speculation or guess-work as to the proximate cause of death."

STANDARD OF REVEW
¶ 10. This court affords a circuit court judge sitting without a jury the same deference as a chancellor. City of Jackson v. Perry, 764 So.2d 373, 376(¶ 9) (Miss.2000). That is, after reviewing the entire record, we will affirm if the judge's findings of fact are supported by substantial, credible evidence and are not manifestly wrong or clearly erroneous. Id. The trial judge in a bench trial "has sole authority for determining credibility of the witnesses." Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss.1987). We review errors of law de novo. City of Jackson, 764 So.2d at 376(¶ 9).

LAW AND ANALYSIS

I. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 11. Young makes two arguments assailing the verdict. Firstly, Young argues that a presumption of liability should have arisen due to UMC's failure to produce Dr. Angel's preference card. Secondly, Young argues that the trial court manifestly erred in finding for UMC because there was substantial evidence that UMC's breach of the standard of care was the proximate cause of Lewanda's death.

A. Whether a presumption of liability should have arisen from the missing preference card.
¶ 12. Testimony established that a "preference card" is a writing by a surgeon that communicates to the operating room staff certain preferences of the surgeon's for a particular operation, such as how to position the patient and the particular sutures and instruments the surgeon wants to use. A surgeon's preference card for a certain surgery is not specific to a single patient, but applies to all of the surgeon's patients undergoing that surgery. Dr. Angel testified that he noted on his breast reduction surgery preference card that he wanted his patients to wear anti-embolic stockings during surgery. He admitted that UMC had not produced the preference card in discovery. Dr. Angel stated that, evidently, the preference card had "disappeared" after a change in UMC's administration.
¶ 13. Young argues that, without Dr. Angel's preference card, he was unable to establish a prima facie case of medical malpractice. He contends that the preference card was a medical record which UMC had a statutory obligation to maintain. See Miss.Code Ann. § 41-9-63 (Rev. 2001). He further argues that UMC's loss of the card should have given rise to a presumption of negligence and liability which UMC was required to rebut.
¶ 14. Young's argument is without merit. Young never presented this burden-shifting argument to the trial court, and he is barred from asserting it for the first time on appeal. Triplett v. City of Vicksburg, 758 So.2d 399, 401(¶ 9) (Miss.2000). The precedent which Young cites does not stand for the proposition that the missing preference card entitled him to a presumption *1276 of liability. Further, UMC's loss of Dr. Angel's preference card did not harm Young. Dr. Angel stated that his preference card specified that the anti-embolic stockings be used in all his breast reduction surgeries. The probative value of the preference card, had it been produced, would have been to establish either that Dr. Angel in fact specified the stockings, or that he did not. If Dr. Angel's preference card did not specify the stockings, then that fact would have bolstered Young's proof that UMC had not used the stockings in Lewanda's surgery. But, there was copious other evidence that UMC did not use the stockings in Lewanda's surgery, such as the complete absence of any notation of their use within the medical records. In fact, the trial court found that the stockings had not been used in Young's surgery. Therefore, Young met his burden of proof to show that the stockings were not used and was unharmed by the absence of the preference card.

B. Whether the verdict was against the overwhelming weight of the evidence because Young proved that UMC's breach of the standard of care proximately caused Lewanda's death.
¶ 15. Young asserts that the verdict was against the overwhelming weight of the evidence because he proved UMC's breach of the standard of care proximately caused Lewanda's death. Mississippi physicians are bound to adhere to nationally recognized standards of care and have a duty to exercise reasonable and ordinary patient care. Palmer v. Biloxi Reg. Med. Ctr. Inc., 564 So.2d 1346, 1354 (Miss.1990). To prove a medical malpractice claim, a plaintiff must show: (1) the existence of a duty on the part of the physician to conform to a specific standard of conduct; (2) the specific standard of conduct; (3) that the physician's breach of the duty was the proximate cause of the plaintiff's injury, and (4) that damages resulted. Barner v. Gorman, 605 So.2d 805, 808-09 (Miss.1992). Generally, these elements must be proven by expert testimony. Palmer, 564 So.2d at 1355. "Not only must this expert [testimony] identify and articulate the requisite standard that was not complied with, the expert [testimony] must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." Barner, 605 So.2d at 809.
¶ 16. In the case sub judice, the court concluded that the standard of care required the use of anti-embolic stockings during Lewanda's surgery. The court also found that UMC had breached the standard of care by failing to use the anti-embolic stockings during Lewanda's surgery. However, the court found the proof of proximate cause lacking because there was insufficient evidence that the non-use of the anti-embolic stockings was the proximate cause of Lewanda's death.
¶ 17. Young contends that the trial court's ruling was against the weight of the evidence because there was substantial, credible evidence that UMC's breach of the standard of care proximately caused Lewanda's death. As support for this argument, he relies upon the medical evidence that a patient's immobility during general anesthesia places the patient at an increased risk of deep venous thrombosis. Young points out that the medical experts generally agreed that anti-embolic stockings help prevent deep venous thrombosis. And, Dr. Apfelberg testified that deep venous thrombi, which are blood clots in the legs, can break off and cause a pulmonary embolus. Further, Dr. Angel testified that there was a temporal relationship between Lewanda's surgery and her fatal pulmonary embolus.
¶ 18. We find that the trial court's conclusion that Young had failed to prove *1277 proximate cause was supported by substantial evidence and was not manifest error. Certainly, there was medical evidence to support a conclusion that Lewanda's fatal pulmonary embolus was causally related to her breast reduction surgery. There was evidence that any surgery that included general anesthesia for over thirty minutes carried an increased risk of a pulmonary embolus. But, Young could not recover upon a showing that the surgery proximately caused Lewanda's fatal pulmonary embolus. Rather, Young needed to show that UMC's failure to use the anti-embolic stockings proximately caused the pulmonary embolus. Specifically, Young had to show that, but for UMC's failure to use the anti-embolic stockings, Lewanda had "a greater than fifty (50) percent chance of a [substantially] better result than was in fact obtained." Harris v. Shields, 568 So.2d 269, 274 (Miss.1990) (quoting Ladner v. Campbell, 515 So.2d 882, 889 (Miss.1987)). No medical expert testified that it was more probable than not that UMC's failure to use the stockings caused Lewanda's fatal pulmonary embolus. While there was testimony that anti-embolic stockings can help prevent the formation of blood clots during surgery, there was no expert testimony that the stockings more likely than not would have prevented Lewanda's fatal pulmonary embolus. Therefore, the evidence that UMC's breach of the standard of care proximately caused the fatal pulmonary embolus was purely speculative. This issue is without merit.

II. WHETHER THE TRIAL COURT ERRED IN DENYING YOUNG'S SPOLIATION MOTION CONCERNING THE MISSING PREFERENCE CARD.
¶ 19. At the conclusion of the trial, Young moved for a finding of spoliation concerning the missing preference card. "When evidence is lost or destroyed by one party (the "spoliator"), thus hindering the other party's ability to prove his case, a presumption is raised that the missing evidence would have been unfavorable to the party responsible for its loss." Thomas v. Isle of Capri Casino, 781 So.2d 125, 133(¶ 37) (Miss.2001). A finding of spoliation may be supported by intentional or negligent destruction of evidence by the spoliator. Id. at (¶ 41). For example, the negligent breach of a statutory duty to maintain medical records has been found to create a presumption that the lost records would have been unfavorable to the spoliator. Id. Additionally, the presumption of unfavorability created by a finding of spoliation allows the fact-finder to draw a general negative inference from the fact of spoliation. Id. at (¶ 37).
¶ 20. Young argued that UMC's loss of Dr. Angel's preference card entitled him to a finding of spoliation and a presumption that the preference card would have been adverse to UMC. The trial court denied the motion. The court found that the preference card was not a medical record that UMC was statutorily required to maintain and that the evidence that the card was lost during a change in administration did not show that UMC's loss of the card was negligent.
¶ 21. On appeal, Young argues that the trial court's ruling was error because he was entitled to a presumption that the preference card would have been adverse to UMC. As discussed above in Issue I, the evidentiary impact of the preference card would have been to support or refute Dr. Angel's testimony that his preference card specified the use of anti-embolic stockings during his breast reduction surgeries. Whether or not Dr. Angel *1278 specified anti-embolic stockings during his breast reduction surgeries was probative of whether the stockings were in fact used in Lewanda's surgery. There was other evidence that the stockings were not used during Lewanda's surgery. The trial court found in favor of Young on this point by concluding that the stockings were not used in Lewanda's surgery. This favorable finding shows that the absence of the preference card did not hinder Young's ability to prove his case. Thomas, 781 So.2d at 133(¶ 37). Even if this Court were to find that Young was entitled to a spoliation presumption, the presumption could not favorably affect the outcome of his case because the presumption cannot substitute for proof of proximate cause. DeLaughter v. Lawrence County Hosp., 601 So.2d 818, 823 (Miss.1992). "[N]egligent treatment is not inferred from [a] missing hospital record." Id. This issue is without merit.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
MYERS, P.J., BRIDGES, IRVING, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. KING, C.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. LEE, P.J., NOT PARTICIPATING.